UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ANGELA A. DECKER,                    :
                                     :
          Plaintiff                  :     No. 1:14-CV-01081
                                     :
     vs.                             :     (Judge Kane)
                                     :
CAROLYN W. COLVIN, ACTING            :
COMMISSIONER OF SOCIAL               :
SECURITY,                            :
                                     :
          Defendant                  :

<u>MEMORANDUM</u>

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Angela A. Decker's claim for social security disability insurance benefits and supplemental security income benefits.  For the reasons that follow, the Court will affirm the Commissioner's decision.

**I.    BACKGROUND**

On January 12, 2012, Decker filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 12, 198, 208-216 and 222.[2]  The applications were initially denied by the Bureau of

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on August 13, 2014.

Disability Determination[3] on April 10, 2012. Tr. 12 and 133-142.
On April 26, 2012, Decker requested a hearing before an
administrative law judge ("ALJ") which was held on August 9, 2013.
Tr. 12, 31-104 and 143-144.  Decker was represented by counsel at
the hearing. Id.  Decker alleged that she became disabled on
November 15, 2010, because of hapatitis C, fibromyalgia,[4] severe
depression, chronic fatigue, high blood pressure and obesity.[5] Tr.

---

3.  The Bureau of Disability Determination is a state agency
which initially evaluates applications for disability insurance
and supplemental security income benefits on behalf of the Social
Security Administration.  Tr. 134 and 139.

4.  "Fibromyalgia is a disorder characterized by widespread
musculoskeletal pain accompanied by fatigue, sleep, memory and
mood issues." Fibromyalgia, Definition,  Mayo Clinic staff,
http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics
/definition/con-20019243 (Last accessed April 15, 2015).  At one
point fibromyalgia was only diagnosed if a patient had 11 out of
18 positive tender or trigger points. The trigger or tender point
testing was actually developed only for research studies but
medical professionals began to use it for diagnostic purposes.
Presently, a diagnosis can be made if a patient has widespread
pain for more than 3 months with no underlying medical condition
that could cause the pain.  There is no blood test or objective
criteria for such a diagnosis to be made.  However, some
physicians still rely on the tender point examination and attempt
to rule out other possible causes, including rheumatological and
autoimmune disorders. Fibromyalgia, Tests and diagnosis,  Mayo
Clinic staff, http://www.mayoclinic.org/diseases-conditions/
fibromyalgia/basics/tests-diagnosis/con-20019243 (Last accessed
April 15, 2015).

5.  On January 27, 2012, Decker weighed 290.4 pounds; on June 15,
2012, 305 pounds; on September 26, 2012, 294.2 pounds; and on
July 2, 2013, 245 pounds. Tr. 403, 512, 551 and 617.  Decker is
5'3" tall. Id.  An individual of such height and weights has a
Body Mass Index of 51.4, 54, 52.1 and 43.4 respectively, and is
considered morbidly obese. Center for Disease Control and
Prevention. Healthy Weight, Adult BMI Calculator,http://www.
cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calcula
(continued...)

133, 208, 210 and 226.  At the administrative hearing Decker amended her alleged disability onset date to January 1, 2012. Tr. 41.  The record reveals that Decker worked full-time through November 15, 2011.  Tr. 36-37, 226-227 and 263.

On August 22, 2013, the ALJ issued a decision denying Decker's applications. Tr. 12-25.  As will be explained in more detail *infra* the ALJ found that Decker failed to prove that she met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Id.  Instead the ALJ found that Decker had the ability to perform a limited range of light work with a sit/stand option as needed and based on the testimony of a vocational expert identified three job which Decker could perform. Tr. 17-18, 24 and 96-100.  On October 1, 2013, Decker filed a request for review with the Appeals Council and on April 10, 2014, the Appeals Council concluded that there was no basis upon which to grant Decker's request for review. Tr. 1-3 and 7-8. Thus, the ALJ's decision stood as the final decision of the Commissioner.

---

5.  (...continued)
tor/bmi_calculator.html (Last accessed April 15, 2015). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www.Mayoclinic.com/health/obesity/DS00314 (Last accessed April 15, 2015).  Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially likely to have serious health problems. Id.

3

Decker then filed a complaint in this court on June 4, 2014. Supporting and opposing briefs were submitted and the appeal[6] became ripe for disposition on October 28, 2014, when Decker filed a reply brief.

Decker was born in the United States on January 3, 1972, and at all times relevant to this matter was considered a "younger individual"[7] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 39, 131-132, 208 and 210.

Decker graduated from high school in 1990 and can read, write, speak and understand the English language and perform basic mathematical functions such as counting change and handling a savings account. Tr. 225, 239 and 458.  During her elementary and secondary schooling, Decker attended regular education classes. Tr. 227.

Decker's work history covers 22 years and at least 16 different employers. Tr. 199, 202-204 and 207.  The records of the Social Security Administration reveal that Decker had earnings in the years 1988 through 1996 and 1999 through 2011. Tr. 199.

---

6.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

7.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Decker was 41 years of age. Tr. 39.

Decker's annual earnings range from a low of $96.88 in 1996 to a high of $17,128.22 in 1994. Id.  After 2000, Decker's annual earning never rose above $16,351.34 or fell below $5359.96. Id. Decker's total earnings were $194,046.34. Id.

After high school Decker for approximately 4 years worked for several different employers, including a nursing home. Tr. 458. Decker then trained to become a medical assistant at Medix School in Towson, Maryland, and then in 1998 or 2000[8] completed a two-year program in business management at Yorktowne Business Institute, York, Pennsylvania. Tr. 45, 227 and 458.  Decker from 2001 to 2003 was employed by an automobile dealership performing clerical and accounting duties. Id.  Decker was married twice and her first husband died in or about 2003 from AIDS and hepatitis C. Tr. 457-458 and 570. After her first husband died, Decker worked at a foundry for about a year and then from August of 2004 to September, 2007, she worked at a pharmacy as a cashier or technician. Tr. 202, 227 and 458.  From March, 2008 to mid-November, 2011, Decker primarily performed work, including cleaning, through temporary employment agencies. Tr. 227 and 458. Decker reported that the last work she performed was 10 hours per day, 4 days per week, at a factory through a temporary employment agency. Tr. 227.

A vocational expert identified Decker's prior work as (1) a parts picker where she would pick parts for assembly at a

_____

8.  The record contains inconsistent dates.

motorcycle manufacturer which was described as unskilled, medium work; (2) a commercial or industrial cleaner described as heavy, unskilled work; (3) a sales clerk described as semi-skilled, light work; (4) a pharmacy technician described as semi-skilled, light work; (5) a cashier described as unskilled, light work; (6) an accounting clerk described as skilled, sedentary work; (7) a cook helper described as unskilled, medium work; (8) a mail sorter described as unskilled, light work; and (9) a nursing assistant which was not described with respect to skill or exertional level.[9]  Tr. 92 and 94-95. The administrative law judge found that

---

9.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine

(continued...)

6

the only positions identified by the vocational expert which qualified as past relevant employment were the commercial or industrial cleaner, sales clerk, pharmacy technician, cashier and mail sorter.[10] Tr. 96-97.

Decker is married but is separated from her husband and lives with her daughter and son in a two-story house; she is able to take care of her personal needs, such as feeding and dressing herself, except she stated that she "sometimes" has difficulty brushing her hair and her daughter assists her with that task; she is able to prepare simple meals and she prepares full meals 3 to 4 times per month; she drives her son to work everyday; she helps

---

9.   (...continued)
    dexterity or inability to sit for long periods of time.

    (c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

    (d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

10.  Past relevant employment in the present case means work performed by Decker during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant employment, the work must also amount to substantial gainful activity and have been performed for a sufficient period of time to learn the job. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

babysit her two grandchildren twice a week; she helps with the
laundry by folding clothes; she performs simple housework such as
dusting and sweeping and washing the dishes; she occasionally goes
shopping with her daughter for clothes; she walks 1 ½ blocks three
times per week for exercise; she feeds and takes care of her dogs
at her house and drives approximately 3 miles to and spends time
at her husband's house feeding his cats; she goes shopping for
groceries once per month; her hobbies include putting puzzles
together and reading books; she reported no problems getting along
with others and occasionally visiting with family members; she
reported playing video games and games on her cell-phone; she
reported no difficulty squatting, kneeling, talking, hearing,
seeing, understanding, following written or spoken instructions
and using her hands; she does not need reminders to address her
personal hygiene needs or to go places; she has no difficulty
finishing what she starts; she can handle stress and changes to
her routine and is able to walk for an hour before needing to
rest; and she is able to handle a savings account and use a
checkbook and money orders  Tr. 39-40, 46, 50-52, 56, 64-65 and
236-243.

     Decker smokes 1 pack of cigarettes per day and has a
substantial history of abusing alcohol and controlled substances,
including cocaine, marijuana and LSD. Tr. 368-369, 457-458 and
570. In March, 2012, Decker reported binging on alcohol "about
once a month where she will have a bottle of wine or whisky and

8

get drunk" but that she stopped using illicit drugs when she was 18 years old. Tr. 458.  Also, in July, 2012, Decker stated that she "drinks [alcohol] in excess about twice a month." Tr. 570.  At the administrative hearing in August, 2013, Decker testified that she stopped drinking alcohol when she started taking medication for diabetes about "seven or eight months" prior to the hearing but admitted "one like night where I was drinking since then." Tr. 68.

Decker argues that (1) the ALJ erred at step 3 of the sequential evaluation process by finding that Decker's impairments did not meet Listing 12.04, Affective Disorders; (2) the ALJ erred by failing to give appropriate weight to the opinion of Decker's treating physician and the opinion of a consultative psychologist; (3) the ALJ failed to properly evaluate Decker's fibromyalgia and credibility; and (4) substantial evidence does not support the ALJ's step 5 determination.

## II.   STANDARD OF REVIEW

A trial court has plenary review of all legal issues decided by the Commissioner. Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007). The trial court's review of any findings of fact, however, is limited to whether those findings are supported by "substantial evidence." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  The substantial evidence standard is highly deferential, and is satisfied with "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d

Cir. 1999)(internal citation omitted). "Where the ALJ's findings
of fact are supported by substantial evidence, we are bound by
those findings, even if we would have decided the factual inquiry
differently."  <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir.
2001). Substantial evidence "does not mean a large or considerable
amount of evidence," but rather "such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
<u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quotation omitted).
Substantial evidence exists only "in relationship to all the other
evidence in the record," <u>see</u> <u>Cotter v. Harris</u>, 642 F.2d 700. 704
(3d Cir. 1981), and therefore a court reviewing the Commissioner's
decision must scrutinize the record as a whole, including whether
the Commissioner adequately developed the record. <u>Shaw v. Chater</u>,
21 F.3d 126, 131 (2d Cir. 2000).

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a disability
> only if his physical or  mental impairment or impairments are
> of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and
> work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work.  For
purposes of the preceding sentence (with respect to any
individual), "work which exists in the national economy"
means work which exists in significant numbers either in the
region where such individual lives or in several regions of
the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating
disability insurance and supplemental security income claims. 20
C.F.R. §404.1520 and 20 C.F.R. § 416.920; <u>Poulos</u>, 474 F.3d at 91-
92.  This process requires the Commissioner to consider, in
sequence, whether a claimant, first, is engaging in substantial
gainful activity; second, has an impairment that is severe or a
combination of impairments that is severe; third, has an
impairment or combination of impairments that meets or equals the
requirements of a listed impairment; fourth, has the residual
functional capacity to return to his or her past work; and, if
not, fifth, whether he or she can perform other work in the
national economy. <u>Id</u>. Four the purposes of this determination,
residual functional capacity is the individual's maximum remaining
ability to do sustained work activities in an ordinary work
setting on a regular and continuing basis.  <u>See</u> Titles 11 and XVI:
Assessing Residual Functional Capacity in Initial Claims, 61
Fed.Reg. 34475 (July 2, 1996).  The residual functional capacity
assessment must include a discussion of the individual's
abilities. <u>Id.</u>; 20 C.F.R. § 404.1545; <u>see</u> <u>Hartranft v. Apfel</u>,181
F.3d 358, 359 n.1 (noting that residual functional capacity is

"defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**III. DISCUSSION**

The ALJ at step one of the sequential evaluation process found that Decker had not engaged in any substantial gainful activity since January 1, 2012, the amended alleged disability onset date.  Tr. 14.

At step two of the sequential evaluation process, the ALJ found that Decker had the following severe impairments: "Morbid Obesity, Lumbar Degenerative Disc Disease, Fibromyalgia, Hepatitis C, Mood Disorder, and Anxiety[]." Id.  The ALJ found that Decker suffered from migraine headaches, diabetes, restless leg syndrome, high blood pressure and a history of substance abuse but that those conditions were non-severe impairments because they did not have more than a minimal impact on Decker's ability to sustain continuous work activity. Tr. 15.  The ALJ noted that Decker's diabetes, restless leg syndrome and hypertension were well-controlled; the medical records did not substantiate ongoing complaints of disabling migraine headaches or treatment for them; and Decker's history of polysubstance abuse was in sustained partial remission. Id.

At step three of the sequential evaluation process the ALJ found that Decker's impairments did not individually or in combination meet or equal a listed impairment. Id.  In so doing the ALJ reviewed, inter alia, the mental health Listing 12.04, and

found that Decker had moderate restrictions with activities of daily living, moderate difficulties with social functioning and no difficulties with concentration, persistence and pace, and no episodes of decompensation of an extended duration. Tr. 16.  The ALJ further indicated that his assessment of those factors was not a residual functional capacity assessment and was only with respect to the severity of the mental impairments at steps 2 and 3 of the sequential evaluation process and that his assessment of Decker's residual functional capacity at step four of the sequential evaluation process would be more detailed and reflect Decker's limitations in activities of daily living, social functioning and concentration, persistence and pace.

At step four of the sequential evaluation process the ALJ found that Decker could not perform her past relevant employment as a commercial or industrial cleaner, sales clerk, pharmacy technician, cashier and mail sorter but that she had the residual functional capacity to perform a limited range of unskilled, light work. Tr. 17 and 23. Specifically, the ALJ found that Decker requires the ability to alternate between sitting and standing positions as needed; she cannot perform overhead reaching, crawling, or climbing of ladders, ropes and scaffolds; she can only occasionally crouch, stoop, and climb ramps and stairs; she is able to tolerate moderate exposure to fumes and hot temperatures; she can only occasionally look downward; she is limited to unskilled work with General Educational Development

13

codes of 1 or 2;[11] and she can only have occasional interaction
with supervisors, co-workers, and the public. Tr. 17-18.   In
setting this residual functional capacity, the ALJ considered
Decker's credibility, past work and her activities of daily
living, the records of the treating medical and mental health
providers, and the opinions of the state agency psychologists and
physicians who evaluated Decker.[12] Tr. 17-23.   The ALJ also found
that Decker's statements concerning the intensity, persistence and
limiting effects of her impairments were not credible to the
extent that they were inconsistent with her ability to engage in
the work as described above. Tr. 18.

Based on the above residual functional capacity and the
testimony of a vocational expert the ALJ found at step five of the
sequential evaluation process that Decker could perform three

_____

11.   The General Educational Development (GED) "embraces those
aspects of education (formal and informal) which are required of
the worker for satisfactory job performance."   The GED scale has
three components: reasoning, mathematical and language.
Reasoning and mathematical abilities are on a scale of 1 at the
low end to 6 at the high end and language on a scale of 1 to 5.
Components of the Definition Trailer, Appendix C, Dictionary of
Occupational Titles (4th Ed., Rev. 1991), United States
Department of Labor, Office of Administrative Law Judges Law
Library,http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/
DOTAPPC.HTM (last accessed April 15, 2015).

12.   On March 6, 2012, Juan B. Mari-Mayans, M.D., reviewed
Decker's medical records on behalf of the Bureau of Disability
Determination and concluded that Decker can occasionally lift
and/or carry 20 pounds and frequently 10 pounds; Decker can stand
and/or walk 6 hours in an 8-hour workday and sit about 6 hours;
Decker is able to push and/or pull up to the weight associated
with lifting and carrying; and Decker has no postural,
manipulative, visual, communicative or environmental limitations.
Tr. 124-125.

unskilled, light work positions which provided for the ability to alternate between sitting and standing as needed and that there were a significant number of such jobs in the national economy. Tr. 24.  The positions identified by the vocational expert were a cleaner-housekeeper, sorter-agriculture, and assembler-electrical accessories. Id.  The vocational expert testified that these positions were in the unskilled category and consistent with the residual functional capacity set by the ALJ. Tr. 62-65.  The vocational expert specifically indicated based on his experience that the positions allowed for a sit/stand option as needed but that Decker's past relevant employment did not allow for such a sit/stand option. Tr. 97-100.

The administrative record in this case is 620 pages in length, primarily consisting of medical and vocational records. The ALJ did an adequate job of reviewing Decker's medical history and vocational background in her decision. Tr. 12-25. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant.

Decker does not challenge the ALJ's identification of her severe and non-severe impairments at step 2 of the sequential evaluation process.  Decker argues that the  ALJ erred at step 3 in failing to find that she met Listing 12.04; failed to give appropriate weight to the opinion of Ann L. Ramage, M.D., Decker's treating physician, and the opinion of Chrissi Hart, Ph.D., the

consultative state agency psychologist, when setting Decker's
residual functional capacity; failed to properly evaluate Decker's
fibromyalgia and credibility; and failed to point to substantial
evidence supporting the determination at step 5 that she could
engage in other employment with a sit/stand option as needed.  The
Court will discuss each argument in turn.

    A.   **Listing 12.04, Affective Disorders**

    The requirements of Listing 12.04 in relevant part are as
follows:

> 12.04 Affective Disorders: Characterized by a
> disturbance of mood, accompanied by a full or partial
> manic or depressive syndrome.  Mood refers to a
> prolonged emotion that colors the whole psychic life;
> it generally involves either depression or elation.
>   The required level of severity for these disorders is
> met when the requirements in both A and B are satisfied
> . . .
>
> A. Medically documented persistence, either continuous
> or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four
> of the following:
>
> a. Anhedonia or pervasive loss of interest in almost
> all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy;
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> I. Hallucinations, delusions or paranoid thinking;
>
> or
>
> 2. Manic syndrome characterized by at least three of
> the following:
> a. Hyperactivity; or
> b. Pressure of speech; or

c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractability; or
g. Involvement in activities that have a high
probability of painful consequences which are not
recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3.   Bipolar syndrome with a history of episodic periods
manifested by the full symptomatic picture of both
manic and depressive syndromes (currently characterized
by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social
functioning; or
3. Marked difficulties in maintaining concentration,
persistence or pace; or
4. Repeated episodes of decompensation, each of
extended duration[.]

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04.

If Decker's severe impairments met or equaled a listed

impairment, she would have been considered disabled per se and

awarded disability benefits.  However, a claimant has the burden

of proving that his or her severe impairment or impairments meet

or equal a listed impairment.  Sullivan v. Zebley, 493 U.S. 521,

530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d).  To do this a

claimant must show that all of the criteria for a listing are met

or equaled.  Id.  An impairment that meets or equals only some of

the criteria for a listed impairment is not sufficient.  Id.

Furthermore, the Commissioner's Listings contemplate that findings

satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one.  The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. § 404.1512(c). Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

Decker's argument is premised on the contention that she met the requirements of Listing 12.04, Affective Disorders.  The court has already addressed the criteria/requirements of that listing. In summary, Decker had to establish, inter alia, that she met the criteria of subsection A and that under subsection B she had

either two "marked" limitations in the categories of activities of
daily living; maintaining social functioning; and concentration,
persistence or pace; or one "marked" limitation coupled with
repeated episodes of decompensation, each of an extended duration.
See 20 C.F.R., Pt. 4040, Subpt. P, App. 1, § 12.04.   The
Commissioner does not argue that Decker failed to establish the
criteria of subsection A. Instead, the Commissioner contends that
Decker failed to meet the criteria of subsection B.

Although Dr. Ramage, who is not a psychiatrist or
psychologist, on July 2, 2013, opined that Decker had marked
limitations with respect to activities of daily living and
maintaining concentration persistence and pace, and repeated
episodes of decompensation, each of an extended duration, Dr.
Ramage's treatment notes lack any objective adverse mental health
findings.  Furthermore, no treating or examining psychologists or
psychiatrist concluded that Decker's impairments met those
criteria, and was unable to engage in a limited range of
unskilled, light work.

In contrast George Ondis, Ph.D., a state agency psychologist,
concluded that Decker's mental conditions did not meet or equal
the criteria of Listings 12.04 as well as 12.06 (Anxiety
Disorders), and was able to meet the basic mental demands of
simple, unskilled work on a competitive basis. Tr. 109-111 and
115.  Dr. Hart, the state agency psychologist who examined Decker,
concluded that other than with respect to her ability to interact
with the general public, Decker was able to function

19

satisfactorily and with respect to that one area of deficiency even Dr. Ramage opined that Decker had an unlimited or very good ability to interact with the general public. Tr. 465-467 and 607. Also, the court's review of the medical records revealed that in July, 2012, Gary B. Zimberg, M.D., a psychiatrist, gave Decker a GAF score of 60, representing the borderline between moderate and mild symptoms[13] and his mental status examination findings support

---

13. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

that opinion[14] as well as the mental status examination findings

of Todd Muneses, M.D., a treating psychiatrist, who examined

Decker on February 20 and May 21, 2013.[15] Tr. 565-566, 571 and

_____

14.  On July 17, 2012, Decker had an appointment based on a
referral from Dr. Ramage with Dr. Zimberg at Wellspan Behavioral
Health, York, Pennsylvania. Tr. 570-572.  A mental status
examination of Decker performed by Dr. Zimberg was essentially
normal. Tr. 570-571. Decker was oriented to person, place and
time, and her mood was fair and her memory intact. Id.  Dr.
Zimberg's diagnostic impression was that Decker suffered from a
mood disorder, not otherwise specified, and a history of
polysubstance dependence in sustained partial remission and he
gave Decker a GAF score of 60. Id.

15.  On February 20, 2013, Decker had an appointment with Dr.
Muneses at YH Behavioral Health Services/Edgar Square, York,
Pennsylvania. Tr. 565-567.  During that appointment Decker
reported "good med compliance and mostly normal appetite and
sleep patterns," and "mood stability despite ongoing stressors."
Tr. 565.  Decker denied significant mood lability or significant
depressive symptomology, suicidal or homicidal thoughts,
perceptual disturbances, and psychotic symptoms. Id.   It was
reported that Decker's musculoskeletal system was within normal
limits; her gait and station were normal; she was well groomed;
her speech was normal; her mood was euthymic and affect reactive;
her thought processes were goal directed; she had no
hallucinations;  her judgment and insight were appropriate; her
attention span was focused; and her fund of knowledge was
appropriate for her age. Tr. 565-566.
     On May 21, 2013, Decker had a second appointment with Dr.
Muneses. Tr. 601-603.  During that appointment Decker reported
good medication compliance; Decker denied medication side
effects; she reported a normal appetite and sleep patterns; she
reported overall mood stability despite ongoing and unchanged
stressors; she denied suicidal and homicidal thoughts, perceptual
disturbances and psychotic symptoms; she reported "good"
activities of daily living and "some socialization;" she denied
mania and impulsivity; and she requested that her current
medication protocol continue. Tr. 601. It was reported that
Decker's musculoskeletal system was within normal limits; her
gait and station were normal; she was well groomed; her speech
was normal; her mood was "good" and affect reactive; her thought
processes were goal directed; she had no hallucinations;  her
judgment and insight were appropriate; and her attention span was
focused. Tr. 601-602.

601-603. It was clearly appropriate for the ALJ to rely on the opinions of Dr. Ondis, Dr. Hart and Dr. Muneses. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Other than the opinion of Dr. Ramage, Decker has proffered no medical opinion, nor has she marshaled the evidence in the record, to support her contention that her condition met the requirements of Listing 12.04. The ALJ gave an adequate explanation for finding that Decker did not meet or equal the criteria of Listing 12.04. The court cannot conclude from the bare medical records and the conclusory opinion of Dr. Ramage that Decker met the requirements of Listing 12.04. The Court finds that the ALJ properly considered and rejected Decker's claim that she met the requirements of Listing 12.04.

**B.   Opinion of Dr. Ramage and Dr. Hart**

The administrative law judge rejected the disability opinions of Dr. Ramage. Although there is no evidence that Dr. Ramage on or about August 10, 2012, examined Decker, on that date Dr. Ramage completed a document on behalf of Decker entitled "Physical Residual Functional Capacity Questionnaire." Tr. 333-337. In that document Dr. Ramage set forth functional limitations which precluded Decker from engaging in full-time work. Id. Dr. Ramage opined, inter alia, that Decker could alternate sitting and standing in 15 minute intervals; Decker could sit, stand, and walk

22

less than 2 hours in an 8-hour workday; Decker needs to take unscheduled breaks during an 8-hour workday every hour for at least 5 minutes; Decker can never use her hands to grasp, turn, or twist objects; Decker can never use her fingers for fine manipulations; Decker can never use her arms for reaching, including overhead; and Decker will on average miss more than four days per month of work as a result of her impairments or treatment. Tr. 334-336. Dr. Ramage further opined that the above limitations applied as of June 20, 2011.[16] Tr. 337.

On July 2, 2013, Dr. Ramage completed two residual functional assessment forms on behalf of Decker. Tr. Tr. 604-614.

In the first form entitled "Mental Impairment Questionnaire (RFC & Listings)," Dr. Ramage stated that Decker suffered from bipolar depression and an anxiety related disorder which rendered her completely unable "to function independently outside the area of one's home." Tr. 604 and 608. Furthermore, in contrast to what was previously reported in treatment notes, Dr. Ramage stated that

---

16. As stated earlier Decker worked full-time through November 15, 2011. Decker reported that from March, 2008, to October 2011, she was employed as a cleaner where she cleaned offices, bathrooms and break rooms. Tr. 252. Decker used mops, brooms, a vacuum cleaner and cleaning supplies. Id. Decker reported reaching with her upper extremities for a total of 8 hours a day. Id. She stated that she walked 8 hours, stooped 2 hours, and kneeled 3 hours and would engage in handling, grabbing and grasping of objects. Id. From October through November 15, 2011, Decker reported walking 10 hours per day; stooping 2 hours; kneeling 2 hours; handling, grabbing or grasping big objects 10 hours; and reaching 10 hours. Id.

Decker had side effects from her medication.[17] Tr. 604. Dr. Ramage also stated that Decker, inter alia, had marked limitations with respect to activities of daily living and maintaining concentration, persistence and pace and that Decker had three episodes of decompensation within a 12 month period, each of at least two weeks duration, although the medical records do not support that statement. Tr. 608.  However, Dr. Ramage asserted that Decker had an unlimited or very good ability to interact appropriately with the general public and maintain socially appropriate behavior but that she could not travel in unfamiliar places or use public transportation. Tr. 607.  Dr. Ramage stated, inter alia, that Decker was unable to meet competitive standards with respect to maintaining attention for two hour segments, maintaining regular attendance, completing a normal workday without interruption from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, and understanding, remembering and carrying out detailed instructions. Tr. 606-607.  Dr. Ramage stated that Decker would on average miss more than four days of work per month as a result of her mental impairments or treatment. Tr. 609. When asked to describe the clinical findings and mental status examinations that demonstrated the severity of Decker's mental impairments and

_____

17.  At appointments with Dr. Ramage on February 13 and April 23, 2012, and April 1 and July 12, 2013, Decker denied medication side effects. Tr. 455, 533, 597-598 and 615-618. Also, at an appointment with Dr. Muneses on May 21, 2013, Decker denied medication side effects. Tr. 601-603.

symptoms, Dr. Ramage merely stated as follows: "Before treatment did not sleep for days, unable to function." Tr. 604.

In the second form entitled "Fibromyalgia Residual Functional Capacity Questionnaire," Dr. Ramage stated that Decker met the American College of Rheumatology criteria for fibromyalgia and that she also suffered from bipolar disorder, hepatitis C, diabetes and high blood pressure. Tr. 610.  When asked to identify the clinical findings, laboratory and test results that demonstrated Decker's medical impairments, Dr. Ramage merely stated "No lab tests for fibromyalgia." Id.  Other than reporting Decker's subjective complaints of fatigue, stiffness, headaches, anxiety, numbness, tingling, panic attacks, depression, sleep problems, and swelling, Dr. Ramage identified only two objective physical examination findings although the treatment records do not substantiate those findings. Id.  Specifically, Dr. Ramage stated that Decker had multiple tender points and muscle weakness. Id.  Dr. Ramage opined that during a typical workday Decker would constantly experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform simple work tasks and that she was incapable of even "low stress" jobs. Tr. 611.  Dr. Ramage's physical functional assessment remained essentially the same as the one issued in August, 2012, which precluded full-time work. Id.  Dr. Ramage, however, now opined that the above limitations applied as of 2002, 9 years

prior to Decker's amended alleged disability onset date and during
a period of time when Decker was working full-time.[18]

On March 30, 2012, Decker was evaluated by Dr. Hart on behalf
of the Bureau of Disability Determination. Tr. 456-462 and 465-
467.  After performing a clinical interview and a mental status
examination, Dr. Hart concluded that Decker suffered from a mood
disorder, not otherwise specified, and generalized anxiety
disorder and gave Decker a Global Assessment of Functioning (GAF)
score of 50, representing the borderline between serious and
moderate symptoms. Tr. 456-462.

During the mental status examination Dr. Hart observed that
Decker was anxious and obese but she was cooperative and her
posture, hygiene, mannerisms and eye contact were all normal;
Decker's gait was normal; Decker had no unusual tics or gestures;
the content of Decker's speech was appropriate and it was clear,
coherent and goal directed; Decker's mood appeared depressed as
evidence by a flat affect; Decker had no hallucinations or
derealization but reported depersonalization; Decker reported
homicidal thoughts and persecutory delusions but no suicidal
thoughts; Decker's motivation for treatment was poor and she had
poor insight into her problems; Decker's intelligence was rated as
average; Decker was oriented to place but not well oriented to
time and date; Decker had difficulty with repeating digits

---

18.  In 2002, Decker earned $5359.96; in 2003 $11,668.17; in 2004
$6241.45; in 2005 $6065.12; in 2006 $15,499.87; in 2007
$14,566.20; in 2008 $16,351.34; in 2009 $6461.56; in 2010
$14,638.30; and in 2011 $11,403.41. Tr. 199.

forwards and backwards; Decker recent memory was intact; Decker
reported difficulties controlling aggressive impulses; Decker's
judgment was intact, i.e., she knew what to do if she found an
envelope in the street which was sealed, addressed and had an
unused stamp on it; and Decker had poor insight into her illness
and her need for treatment. Tr. 458.

Dr. Hart completed, in addition to preparing a written report
of her examination of Decker, a document entitled "Medical Source
Statement of Ability to Do Work-Related Activities (Mental)." Tr.
465-467. In the document Dr. Hart was asked to rate various
mental functional abilities as follows:

- <u>None</u>    - Absent or minimal limitations.  If limitations
                are present they are transient and/or expectable
                reactions to psychological stressors.
- <u>Slight</u>  - There is some mild limitation in the area, but
                the individual can generally function well.
- <u>Moderate</u> - There is moderate limitation in this area, but
                the individual is still able to function
                satisfactorily.
- <u>Marked</u>  - There is serious limitation in this area. The
                ability to function is severely limited but not
                precluded.
- <u>Extreme</u> - There is major limitation in this area. There
                is no useful ability to function in this area.

Tr. 465. In 9 out of 10 areas of mental functioning Dr. Hart found
that Decker had minimal (none), mild (slight) or moderate
limitations. Tr. 466. Dr. Hart found that Decker had the ability
to function satisfactorily with respect to understanding,
remembering and carrying out simple and detailed instructions;
making judgments on simple work-related decisions; interacting
appropriately with supervisors and co-workers; and responding

27

appropriately to work pressures in a usual work setting and to changes in a routine work setting. Id.  The one area of difficulty found by Dr. Hart was that Decker had an extreme limitation with respect to interacting with the public. Id.

The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000).  The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law judge is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). In the present case, the administrative law judge in her decision specifically addressed the opinion of Dr. Ramage as well as the opinion of Dr. Hart.[19] Tr. 18-23.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it

---

19. Because Dr. Hart was a non-treating psychologist no special consideration was given to his opinion.

is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).  In setting Decker's mental and physical residual functional capacity the administrative law judge appropriately considered the contrary opinions of Dr. Ondis, Dr. Zimberg, and Dr. Mari-Mayans and the objective medical evidence. The ALJ concluded that the mental and physical functional assessments of Dr. Ramage were not adequately supported by objective medical evidence.

        The administrative law judge relied on the opinions of Dr. Ondis and Dr. Hart.  Contrary to Decker's argument, Dr. Hart although finding an extreme limitation with respect to Decker's ability to interact with the general public, concluded that Decker could function satisfactorily from a mental standpoint. Furthermore, the ALJ appropriately relied on the opinion of Dr. Ondis, the state agency psychologist, who reviewed Decker's medical records. Dr. Ondis stated that Dr. Hart overstated Decker's limitations and, furthermore, as stated above even Dr. Ramage found that Decker had no mental limitation with respect to

her interaction with the general public. The administrative law judge's reliance on the opinions of Dr. Hart and Dr. Ondis was appropriate. See Chandler v. Commissioner of Soc. Sec., *supra*.

### C. ALJ's Consideration of Decker's Fibromyalgia and Credibility

Contrary to Decker's assertion, the ALJ appropriately considered Decker's fibromyalgia. The ALJ found that the fibromyalgia was a severe, medically determinable impairment but that Decker's claims relating to the limitations associated with that severe impairment were overstated and did not preclude Decker from engaging in a limited range of light work. Any assessment of Decker's limitations associated with Decker's fibromyalgia is directly linked to an assessment of her credibility. There are no objective tests for the condition, other the tender or trigger point examination which is not presently required to diagnose the illness.  The illness is diagnosed based on subjective complaints and by excluding all other possible illnesses.  Consequently, the limitations asserted by a claimant are directly related to the claimant's credibility and an ALJ does not have to accept a physician's assessment of a claimant's credibility or a claimant's subjective claims regarding her physical or mental limitations and the pain associated with the illness. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to

make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").

In the present case the ALJ sufficiently explained her reasons for finding Decker's subjective complaints overstated. Decker's allegations were not fully consistent longitudinally, particularly with respect to her abilities and activities of daily living and the objective medical evidence which showed that her symptoms improved with medication; her pain symptoms were not consistently reported as debilitating; and she had a normal gait and her extremities were within normal limits. Tr. 22, 236-246, 452-456, 458, 480-481, 488-491, 506-507, 533-537, 555-557, 565, 597-601 and 615. Normal physical examination findings can constitute substantial evidence supporting an ALJ's determination that a claimant's complaints of debilitating pain are not credible. See Orbin v. Barnhart, 38 F.Appx, 822, 822-23 (3d Cir. 2002)(noting that the relevant consideration is not claimant's fibromyalgia diagnosis, but to what extent her illness caused

functional limitations). The physical examinations performed by Decker's treating physicians did not reveal any problems with Decker's gait, muscle strength and range of motion of her joints.

Because the administrative law judge observed and heard Decker testify, the administrative law judge is the one best suited to assess her credibility.

### D.   The ALJ's Step 5 Determination

Decker's final argument is that the ALJ's step 5 determination is not supported by substantial evidence. Specifically, Decker asserts that there was insufficient evidence to conclude that the jobs which the ALJ found Decker could perform permitted a sit/stand option as needed.  This argument is devoid of merit because the vocational expert was instructed to consider an individual who required the option to alternate sitting and standing "as needed." Tr. 97. The vocational expert then identified jobs meeting that requirement, as well as the other limitations set by the ALJ. Tr. 95-100.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that there is substantial evidence to affirm the decision of the Commissioner of the Social Security Administration upholding the decision of the ALJ denying disability insurance benefits and supplemental security income payments to Decker.  The Court will affirm the

decision of the Commissioner.   An order consistent with this memorandum follows.